Well, good afternoon, everyone, and we'll call the case of Hardcastle v. Commissioner Thank you, and good afternoon, Your Honors. Tom Galgen is from the Philadelphia DA's Office for the Commonwealth of Pelleas Appellants. This case comes before the court again almost 27 years after the murders of Joseph Gregg and Ernestine Dennis for an older African-American couple who were living in an African-American neighborhood, and Donald Hardcastle was convicted of stabbing them about 30 times each and setting them to death. I see from the clock that you didn't make the motion, you were requesting five minutes for rebuttal? Tom Galgen That's correct, Sarah. Thank you very much for stopping me to talk about it any further. Tom Galgen That request will be granted. Tom Galgen Thank you very much. As long as you're stopped, let me ask you a question about the standard of review here. Your opponents take it at task in their brief and say you never address whether the district court's opinion stands up under clearly erroneous review, and in fact, I'm wondering, what do you think about clearly erroneous review? You don't seem to take this head-on, you seem to say that we really don't owe much deference here because it's so much after the fact. Are you asserting this isn't clearly erroneous review on the factual findings? Tom Galgen My first argument, Your Honor, is yes, that this is not clearly erroneous review, not simply because of the age of the case, but because of the several legal errors that the district court made to take it out of the realm of fact. Tom Galgen Let's leave legal error out of this. I'm not talking about legal stuff. There was fact-finding going on here, right? Tom Galgen That's correct. Okay. As to fact-finding, are we not bound by our own precedent to apply clearly erroneous review to the district court's fact-finding? Tom Galgen Usually, yes, but not if the court explicitly refused to consider some evidence that underbats and they were obliged, that the court was obliged to consider. And usually... Dr. Robert R. Reilly That's an issue. That's not fact-finding. That's an issue of admission of evidence, right? Tom Galgen That is correct, Your Honor. Dr. Robert R. Reilly And as you know, I'm very familiar with this case. Tom Galgen Yes, Your Honor. Dr. Robert R. Reilly And I'm familiar with how the Commonwealth was pleading to have us listen to their explanation. And I find it somewhat ludicrous that now you come in and say, well, you shouldn't pay any attention to our explanation, but yet it was you, the Commonwealth, who wanted us to listen to them. Tom Galgen Your Honor, what we said the first time was that there should be a hearing. Dr. Robert R. Reilly Right. Tom Galgen And our... Dr. Robert R. Reilly You reiterated that throughout the argument last time. Tom Galgen Yes. Dr. Robert R. Reilly And as you will recall, Judge Nygaard dissented saying that there was an adequate record for us to decide the case. Judge Sirica and I bent over backwards because of your insistence that you wanted a chance to explain, to give you a chance to explain, and I find it somewhat ironic now that having explained, you don't want us to pay any attention to the explanation. Tom Galgen That's exactly the opposite of what I'm arguing, Your Honor. My point is that the district court did not listen to our explanations. Judge Sirica Well, wait, wait, wait. When you said that's not what you're arguing, I'm going to quote you your reply brief at page 5. In Snyder, the court believed there was no realistic possibility that an evidentiary hearing would shed any light on a decade-old jury selection. If that is true, then the result of that hearing should be subject to less deference. Tom Galgen Yes. Judge Sirica I don't know any way to read that except for you saying, since we're a quarter of a century past this, the result of the hearing should be given zero deference. I mean, like it should be treated as a nullity. Is that not what that language means? Tom Galgen Your Honor, the fact that we asked for a hearing does not mean that we agree in advance to what the district court did. Judge Sirica I don't think anybody's suggesting that you should. What Judge Roth and I are both puzzled by is your insistence that because this happened a long time ago, whatever the judge decided, I assume maybe if the judge decided stuff you liked, you'd say, give that deference. But you seem to be saying here, I don't know any other way to read this language. If it's true that it – if that's true, what the Snyder court said, then the result of the hearing should be subject to less deference. In other words, just ignore what you asked to have happen. Tom Galgen That's not true, Your Honor, and that's a mischaracterization of my argument with all respect. Judge Sirica Well, why don't you tell us what your argument is on this standard of review issue? Tom Galgen I think clearly the – whatever standard of review this court adopts for this case I think is very critical. So why don't you tell us what you think we should do, how we should review what the district court found and what they concluded? Judge Sirica Your Honor, the district court made legal errors in its application of Batson, and that's a first principle. Its failure to consider certain critical evidence and its reliance on inadmissible evidence means its factual determinations must be revisited de novo. There's a second point that I'm making that when you're dealing with a case, a state conviction like this that became final decades ago, it's improper to grant relief – this is the argument that I made back in 2004 – it is improper to grant relief without giving the prosecution a chance to explain its rights. Tom Galgen Right. Judge Sirica So you were given that. Tom Galgen Yes. Judge Sirica Now I'm going to ask you, what do you mean when you say the result of that hearing should be subject to less deference, meaning less than no realistic possibility could shed any light? Tom Galgen What I mean by that is that the hearing after we explain our race-neutral reasons, our assessment of the record, the decision made by the district court is not infallible at that point. I'm – we asked to be heard, but we are not agreed to it in advance. Judge Sirica You want – isn't what you want is because of these legal errors that you allege, that you want us to look at this record anew and to take plenary review of this case, isn't that what you're – isn't that what you've asked for? Tom Galgen Yes. Judge Sirica In essence? Tom Galgen Yes. Judge Sirica Versus us looking at what Judge Edova found and making a determination as to whether his findings were clearly erroneous. Tom Galgen That's correct. Judge Sirica Isn't that the difference in your argument from where the petitioner is? Tom Galgen Absolutely. And if that's your argument, what's your legal authority for us to take plenary review as opposed to clearly erroneous review? What case are you relying on? Tom Galgen I have two authorities, Your Honor. First for the proposition that Judge Fischer just mentioned. Batson explains that the court assessing the reasons behind preemptory strikes must take into account all evidence which tends to disprove or prove whether or not the strikes were based on racial bias. All evidence that tends to prove or disprove. So when you take a category of evidence out of the calculation that tends to prove or disprove, that means that the full record wasn't looked at. And under Batson and under Abu-Jamal, this court decided a few months ago. And even under Hardcastle, the first Hardcastle opinion in this case, Your Honor, when the court remanded it, the court said you must look to the district court, you must look at all the evidence that tends to prove or disprove whether or not the preemptory challenges were used to exclude on the basis of race. Judge Sirica All right. And since you cited Batson, I'll cite Batson. The Supreme Court said the trial court will then, at this step three, it's a very one sentence on steps of the trial court, will then have the duty to determine if the defendant has established purposeful discrimination. Footnote 21. In a recent Title VII sex discrimination case, we stated that a finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court. How do you get around the fact that the final question here, which in essence you're asking us to overturn, is a finding of fact to which the Supreme Court and Batson itself said they're entitled to appropriate deference? Judge Sirica Again, two things. First of all, I think because the universe of evidence was improperly constricted, we get the NoVo review. Number two, in Riley, this court refused to defer to the findings of a state court who had rejected a Batson claim saying that that case was too old, it involved different judges, a different courtroom, and the memories were not strong. And this court in Riley refused to give the state court findings deference. Judge Silica Riley, I'll ask you to find me anywhere in Riley where the court said clearly erroneous review of factual evidence does not apply here. I'm aware in Riley of the court majority and then in bank decision saying, you know, in looking at the record here, we don't think there's record support, and one of the reasons we don't think there's record support is the age. But I'll ask you if you can find me anywhere in Riley where it says we're not applying clearly erroneous review, leaving aside the fact that that's a different legal setting. It's this court looking at state court on pre-ADIPA case law, and this is post-ADIPA review of the district court's habeas findings. Just setting all that aside, how do you get out of Riley a statement that clearly erroneous review doesn't apply? Remember that Riley, I don't have the case up here with me. The citation in my brief stands, and I stand by that. Remember in Riley also that it was a 6-1-5 on bank decision. So the only holding in Riley which was controlled by Judge Becker's concurrence was that one of the jurors, there was nothing in the record to suggest that there was a race-neutral reason. What Judge Becker said in the rest of his opinion is that he was very concerned that the majority or the plurality in Riley had otherwise engaged in a review that was too far outside of the clearly erroneous standard. And my point is that in the Baxton context, when you're talking about a decision, a judgment that's become final years ago, where obviously memories have faded, Ms. Rubino in this case was candid that she didn't remember anything. So it's not as if it's not a mutual credibility assessment. And I would say, Your Honor, perhaps you may be right that that's something to be taken into account, but I'm certainly struggling with your assertion that clearly erroneous doesn't apply. But leaving that aside for a second, let me ask you this. If it does apply, do you lose? No. So how do you not lose if clearly erroneous is the standard? Clearly erroneous is an overlay to the ultimate burden that the Baxton claimant carries. That is, the Baxton claimant must show that it is more likely than not that any particular peremptory strike was the product of racial discrimination. If you look at the six peremptory strikes in this case that Judge Padova found were the product of racial discrimination, every single one of them, every single one of them, there are plain race-neutral reasons in the record. Every single one of them, there are clear differences between the jurors accepted and the jurors rejected. Ms. Rubino did no jury shuffling, as in Miller, L. Ms. Rubino did no differential questioning during voir dire. The only thing, the only piece of evidence on which this is based is that the statistic that 12 of Ms. Rubino's 15 peremptory challenges were used against African Americans. If Ms. Rubino loses her credibility, do we have to believe... Did the district court, if he determined she had lost credibility, have to believe anything she said? If the district court found that she... She didn't have to. No. Right. No. And there is a support in the record for her loss of credibility in her insistence that she did not depend on Henderson in the state court at the time of the motion for the mistrial, and yet she is quoted in the contemporaneous transcripts as citing Henderson. And to me, this obvious discordance in what she said then and what she said at the hearing in the district court lends considerable weight to the determination that she's not credible. Well, Your Honor, if you believe that everything she says is not true, the court can do that. Right. And the problem is, with an approach like that, is remember, it is, first of all, it's the defendant's burden. We're not talking about a sufficiency of evidence question. It is the defendant's burden to prove that a particular peremptory strike was racially based. Right. And one of the ways of proving that is pretext, right? Right. And if you take out what Ms. Rubino said out of the mix, that doesn't necessarily prove discrimination. There has to be evidence from some source that she intended to discriminate, not simply that she was – Well, that's the prima facie step, right? I mean, doesn't – don't – I think everybody had agreed, did they not, that at step one, you've got to make a prima facie case. And that was done. And so at step two, which Judge Vidova said you carried, there's a burden of production that says, these are my race and for reasons. You get to step three, and that's where the rubber meets the road. And the question at that juncture, I take it, as Judge Roth's indicating, is, who are you going to believe? And the case law seems to indicate that the crucial question is, is the prosecutor's claim of a race-neutral reason credible? Doesn't – isn't that what the case law says? Well, yes and no. That's what it says during the – if the Batson claim is raised during trial. Remember, here it's not a garden-variety credibility determination because Ms. Rubino says, I don't remember. Let's look at the record and try to flare things out. So what Ms. – what Judge Vidova did, and this is another – goes against the standard of review. Another reason why this case stands out from others in terms of what the standard is, is because Ms. Rubino didn't remember, and because what the – what Judge Vidova did is simply look at the record and measure what her interpretation of the record and determine whether that's plausible, which I should say is pretty much exactly – well, not exactly, but it's similar to what the state court did on direct appeal. They had to look at the record and see if there were race-neutral reasons and whether it was plausible that there were explanations other than race. Let me ask you a very preliminary question that you didn't raise, but I take it that it's your position that there was – that a timely objection was made in this case. Yeah, in state court, Your Honor, we argue that it was not made, but the state court – That was passed by in – Yes. – the previous appeal. Okay. I just – all right. Right. And as I understood it exactly, Your Honor, that that's no longer on the table. Let me speak – you argue that the defendant's – or that the petitioner's failure to make juror comparison arguments in state courts means that they should have been denied a federal evidentiary hearing. Does that – can that possibly hold water in light of the fact that, as Judge Ross said the last time you were before this court, you requested the very evidentiary hearing that you ended up with? Well, Your Honor, I think we have to go back. I must say I'm sort of taken aback at this – at the way that the first argument and the first brief is – or has been interpreted. Okay. My argument the first time around was that the state court decided the claim that was presented to them reasonably and that we should win, that there should be no new trial. The case should be remanded for review of his other claims. What this – what Judge Cordova said is – I'm going to look at the record. I'm just going to tell you there was a bathroom violation. I came up here and I said, Judge Cordova's wrong for a couple of reasons. Number one, the state court reasonably decided what was in front of it. But number two, you can't just grant a hearing without – I mean, grant relief without hearing what Ms. Rubino has to say. Ms. Rubino testified. I don't think I'm obligated to say this court is bound by what happens thereafter. Well, Mr. DelGennis, did you think that the outcome first of the remand was that you would get to put on evidence and the folks on the other side wouldn't? Well, it's not so much that, but the – I'm not arguing that they couldn't put on evidence, Your Honor. I'm arguing that – That's your default argument all about. If your default argument isn't, hey, don't look at those juror comparisons because they never raised that before. Aren't you really saying we'll come to court and we'll give evidence, but don't listen to them because they never came forward with that evidence in state court? Well, I thought I lost that in front of the district court the first time around. That was the whole point of my argument that everything's defaulted except the 12 of 15 argument. The district court said no and then looked at the whole case de novo. And then when this court reversed, I was in front of the district court again who had already rejected the default argument. I thought that this was – the claim had to be reviewed de novo. Now, the hearing hadn't happened during the – obviously during the first appeal. I don't know what errors are going to happen in – when Judge Padova has a hearing. I don't know what the testimony is going to be beforehand. I do know that when Judge Padova ordered us to produce every juror – notes of every juror selection process that Ms. Rubino had ever been part of, and I took an appeal to this court, frankly, I was slapped down fairly hard for – and I thought the message was it's time to put on – it's time to have this hearing and we'll argue about it later. And that's, I think, what's got – I don't want to speak for anybody else. That's what's got me a little confused about the default argument. I'm confused on two points with that. The first one is it seems to me that you are – you might be accused of confusing a claim and proof of a claim. There's a claim on the table that there's a Batson violation. Juror comparisons is one type of proof of that claim. So I'm not sure where the law is that says you default on proof as opposed to defaulting on a claim. But getting past that, I'll ask – I think you might be right, Your Honor. I think I – as I go through this, in all honesty, I don't think I litigated this case as precisely and as well as I could have. In my defense, there's only one of me. There's 300 pages. I don't know if you saw the petition and the reply. I did the best I could. But I will say, Your Honor, I will say that it has been my position from the beginning of this case that the federal courts are limited to looking at what was in front of the state court. Now, I thought that also included various arguments, policy arguments, comparison arguments. I thought it included everything. The issue would be, was there a presentation of the state court beyond the motion for the mistrial of evidence of the discrimination? And there wasn't, and there wasn't because despite the defense's efforts and despite some efforts by the prosecution, the state court wouldn't hold a hearing. So – Although – So it then came about the issue, can we at this point go into a hearing? And in the first review of this court, it is inherent in our sending it back, remanding it to have a hearing, that it is appropriate to have a hearing because we certainly wouldn't send it back for a hearing if it was inappropriate to have a hearing or if we had not decided that the defense had been prevented or precluded in the state court from presenting this evidence that they asked to present, and for that reason it was inappropriate for the district court to go into this. Going into it then, you can't just go into part of it and say, as Judge Jordan has been saying, well, gee whiz, we aren't going to let you show pretext by juror comparison. You can only show pretext by quotations from the prosecution that are discriminatory. Well, exactly. I mean, I thought we went back down and we had the hearing in front of Judge Padova, and I thought that these, you know, at that point when we come back here, if we had to come back here, this court was properly reviewing the propriety of the hearing in front of Judge Padova, the propriety of Judge Padova's decision. That's not inconsistent to me at all. I thought I was doing what the court wanted me to do. You thought we'd be reviewing the propriety of the hearing? Yes, and that means, I don't mean the propriety of the hearing qua hearing. I mean the usual types of appellate issues that come out of when there's, you know, an evidentiary hearing below. Why don't you get to the legal points that on review you claim changes the standard review. Get to the legal points. What are the legal points? What errors did Judge Padova make in step three? The district court, number one, refused to consider the way the defense was using its strikes, which even though it's very clearly relevant to the prosecutor's decision to use or not to use a preemptory challenge, at the very least it provides a contemporaneous corroboration about whether certain jurors seem pro-prosecution or pro-defense to people in the courtroom. All right. Let me stop you there. If we agree with you on that, where does that put this review? That means that this court is positioned and should examine the entire record and come to its own conclusion. Doesn't it mean that we only need to review his review of that particular juror where, in fact, they refused to look at the strategy behind the strikes? No, because the only real piece of evidence that Mr. Dunham has is the 12 of 15 statistics. So anything, any contrary evidence that we can put on, for example, how the defense was using the strikes, and I have more, and I'd love to get to that. I know. Go ahead. It changes the meaning of the import of the statistics. The defense used 18 of its 19 preemptory strikes to challenge white jurors. So the prosecutor knew that if she accepted a white juror, it was likely, not possible, likely the defense would strike. Okay. So this goes to statistics. Does it go to the juror comparison? No. A juror comparison is a separate issue, but I'm saying that the – Because we only have to find that one juror was stricken, was removed for racial reasons. But every single – that's correct. But every single juror for whom Judge Padova made that decision was informed by several things. Number one, he said, okay, I understand that there are race neutral reasons, but here are the three counter arguments. Number one, juror comparisons. Number two, the statistics, the 12 of 15. He said those things outweigh. But supposing we put the statistics aside? Then he has no case. What about the juror comparison? Well, the thing about the juror comparisons, I see I'm out of time. We can skip this. None of that. We're going to give you another five minutes. And then at the end of five minutes, we'll determine whether or not we're going to give you another five minutes. Thank you. Thank you, Your Honor. I very much appreciate it. It is a basic – the juror comparisons are based on a basic legal error, and that's this. In equal protection jurisprudence, whether it's Title VII, whether it's that, and you compare people who were treated differently to see – to reach a conclusion about discrimination. But you were dealing with statistics, and my question was, does your statistics argument bear only on – does your philosophy of strikes argument bear only on the statistics? Well, yeah, but it bears on the ultimate decision, and the statistics are part of it. How does it bear on anything other than statistics? You're saying specifically, my juror, that the fact that defense was striking whites? Yeah, I mean, okay, it can. It can. It would be an example of why the jurors are not similarly situated, you know, if you look at it that way. I mean, these are all – it's hard to separate all of this out. My point with the juror comparisons is that if you're comparing people who are not similarly situated, if there are obvious material differences, then it's not probative. And this is, again, a requirement that's in Title VII. It's in Batson. You can find language about similarly situated jurors in Snyder and Miller-El and in Bond. Doesn't Miller-El refute your argument on similarly situated? No, absolutely not, Your Honor. The court says in Miller-El – What note six? The court says specifically that jurors being compared are similarly situated and, quote, differences seem far from significant. What the court says in Miller-El and what Mr. Dunn has said is that, hey, there are no two jurors are exactly alike. That's a straw man argument. I'm not making that argument. The littles are arguing it. Given the way you've argued this, how does – I guess it puts the court in the quandary of asking, so what would ever be good enough from the perspective of the commonwealth? Well, look at Miller-El. It's a great example. Miller-El, in that case, the Supreme Court made a couple of very narrow juror comparisons, saying specifically that the jurors that were being compared seemed similar. The court also in Miller-El shied away from making comparisons that the court noticed were closer calls. They didn't do it. Well, here's the challenge we've got with your approach, and you may be able to walk me through a way to see it more clearly from your perspective. You seem to be saying at one point in your argument and briefing that small sample sizes mean you really can't pay any attention to statistical things. And then at the same time, you seem to be saying that you don't have people who are truly similarly situated, which, of course, given the small sample size, it might be difficult to say you'd ever, ever have people who are similarly situated in the way the commonwealth seems to think they ought to be. And so I'm wondering if the ultimate logic that you drive at by taking both those positions is you can never have a juror comparison. That's not at all what I'm saying, Your Honor. And I'm not saying that my arguments are not technical. What the district court did here was use kind of a clump analysis, cherry-picking one characteristic at a time that Ms. Rubino identified as something that she liked or didn't like in the juror. Like, for example, marital status. Ms. Rubino said at the hearing below, you know what, I generally like married jurors. She didn't say I always like married jurors. I generally like married jurors. So what the district court did is say, well, here's a list of single jurors you picked. And look at this. I looked at your chart. I mean, it's another one of the single jurors who was accepted by the prosecution was Juror Jean Owad, who was a good friend of a police officer, boldly asserted her strong support of the death penalty. And in fact, she was such a clearly pro-prosecution juror, and this is a point I want to make, the defense argued in state court that she should have been excused for cause. That goes for both Juror Owad and Juror Dougherty. They should be a stop, it seems to me, if we're talking about waiver arguments. This goes beyond waiver default. Shouldn't there be some sort of a stopple argument? They can't compare these jurors and say they are materially similar to the jurors who the prosecution accepted. There's another example, another single juror accepted by the prosecution, James Dougherty. He knew one of the police officers in the case. How is that not valid? How is that a similar juror to someone who the prosecution accepted? There's Mary Ann Palma, another juror who was single and whose father was a fire captain. Donald Hardcastle committed arson. So it is then your position that it's conceivable that in some case you could have juror comparisons, but that in this case it's impossible because there was really no way to do juror comparisons in this case. Well, I'm saying that in this, it absolutely is possible to do juror comparisons in a narrow way as in Miller-El. In this case, the district court didn't do it. And it's my feeling if you look at actually the jurors who were struck that there's no one who was similarly enough situated. Okay. That's the key point. Help us understand what you think Judge Padova did wrong because you say they're not similarly enough situated. In my reading of Judge Padova's opinion, he seemed to be trying to be at pains to say, okay, for this juror, these are the things that Ms. Rubino specifically identified as the reasons and quoted right from her testimony. These are the things she said were important. And then said, all right, how do I see whether those characteristics identified by the prosecutor stack up when I look across all the rest of the people? And I'll look at every characteristic she identifies and look across the whole set of jurors. What else was Judge Padova supposed to do? How else would he do it? By looking at one juror at a time. Not one characteristic at a time. One juror at a time. And also by considering the arguments that we make about why we accepted other jurors, which Judge Padova did not do at all. Every time that what happened in this case, the way it played out is every time Hardcastle and his attorneys identified a counter example. Here's a young juror who the prosecution accepted. Here's a married juror, a single juror who the prosecution accepted. Every time there was even one counter example, Judge Padova found that that factor that Ms. Rubino identified was false. How can you say that when you won a quarter of the arguments? I mean, there were eight jurors in play, and he said, well, as to two of them, I was wrong before. I see you're correct. Exactly. Because those were perfect. Those were examples. I guess I'm having a hard time with you saying he always did it. He never did this. And there's two examples in the record that show he did do what you wanted. On two occasions, at least, he did what you wanted. Well, for example, he found the only race-neutral reasons he accepted were those without counter examples, as I say. For example, the fact that Ms. Rubino explained about not liking or disfavoring social workers, psychology majors, that type. There weren't any counter examples. He did treat that one as having counter examples, though. There was a suggestion by your opponent that, wait, there are other people who are underemployed here. This is a question of being underemployed, and he said, I don't think that really works. He looked at their counter example and said, I'm siding with the other side. I'm thinking this is a person that's different enough that that's not an adequate comparison. Well, that's different from the way I read that. The way I read that particular juror was that, in fact, there weren't any counter examples. He said there are zero counter examples of that characteristic, so I believe it. Mr. DelGhiass, your time is up. You've reserved some rebuttal. Why don't we hear from Mr. Dunham? All right. Thank you, Your Honor. Thank you, Your Honor. Mr. Dunham? Thank you, Your Honor. Mr. Dunham, before you get too comfortable up there while you're separating your papers, isn't it, at least procedurally, how this case got back to the district court with its absence of state review on the Batson issue and its directive from our court? Isn't this case back – or wasn't this case back in the district court in a different posture than other cases would be? Shouldn't we be perhaps looking at this in a different way than we would on a typical case with the findings of fact? Well, Your Honor, it's definitely back in a different posture. Yeah. It's back in a different posture, 20 years for round numbers, 25 years elapsed when it came back. Ms. Rubino acknowledges that she has no recollection of the veneer men or the actual reasons for her strikes. She doesn't have her recollection refreshed at all. Martha, basically, three people who were speculating as to what happened. Ms. Rubino speculated as to what happened. Your client speculated as to what happened. And the district court speculated as to what happened. So why should we look at this with our standard, clearly erroneous review? Well, I'd like to start with Mr. Dulgence's own argument in the district court because he dealt with this right after the close of the hearing and in the oral argument. And when he opened his oral argument, this is what he said to Judge Cordova. This has obviously been a long case, but at this point, I think the question is simple. And the only question is, has the petitioner met his burden to prove by preponderance of the evidence that any particular parametric strike exercised by Ms. Rubino in the 1982 trial was motivated by race? Now, this is not that difficult a question. I mean, it's not quantum physics. It's like any other issue of credibility or testimony that Your Honor deals with every day. What happened was this court, the first time around, sent the case back for Step 2 and Step 3 of Batson. That's the same kind of Batson inquiry that's done all the time. Now, clearly, there's a passage of time, and it's a long passage of time. But in Wilson v. Deard, there was 19 years that it passed, from the time of the trial to the time of the habeas evidentiary hearing. From May 1984 to September of 2003. Nineteen years passed, and this court applied clear error review. In Bond v. Deard, the trial was in February of 1993. The habeas hearing was in 2006. Portions of that dealt with the state court record. Portions of that dealt with the federal district court's evidentiary hearing on it. And 13 years later, this court applied clear error. The nature of the district court's fact-finding here is traditional fact-finding. What makes it difficult is the passage of time. Now, Batson has allocated the burden of passage of time. What happens is, if there's passage of time, it's harder for a petitioner to get past Step 1. If a petitioner gets past Step 1, at Step 2, it's harder on the Commonwealth, because they have to come up with reasons. But that isn't something that affects the standard of review. That has to do with how good the evidence is. Millerell recognized that. Snyder recognized that. This court in Holloway recognized that. It's a difficult problem. But it's an evidentiary problem that doesn't change the nature of the fact-finding that's done by the district court. Now, this court, when it sent this case back, clearly defined what the mandate was. It clearly indicated what Judge Padova was supposed to do. He was supposed to because the court deemed it unfair to grant relief, even though the record contained what we felt was overwhelming evidence of discrimination, and Judge Padova found it with respect to six jurors. This court felt it was unfair to deny the Commonwealth an opportunity to place their views on the record. Now, let's look at this historically. Well, let me interrupt you and ask this question. One of the things that your opponent is strongly asserting, if I understand his argument, is that you can't pay attention to the juror comparisons because they're not similarly situated. You can't pay attention to the statistics because the sample size is too small. You're, at that point, left with the question of credibility. There were no standard opportunities for credibility assessment. And where the district court did make a credibility judgment in faulting Ms. Rubino with respect to her reliance on Henderson, the judge got it wrong because he said she didn't ever disclaim having racial motivations. And, in fact, we can point you to two places in the record where, in the oral argument, she said, I never did it on the basis of race. I just did it twice. So even there, now I'm interpolating a little bit, but I take their argument to be even there, he just said wrong. So all three of the arguments he relied on are gone. Focus in on that last one first because that goes to this issue, I think, that Judge Fischer was raising about credibility determinations. What are we to make of Judge Padova saying she never disclaimed it when your opponent can say, well, there's two places in the record where she did? Well, there are a number of responses. Let me deal first with a disclaimer. I just want a response to that. When Judge Padova found as a fact that Ms. Rubino had relied upon Henderson, he lists a number of factors that go into his determination that she relied on Henderson. And they include the fact that she briefed Henderson in the written brief to the en banc court. She specifically argued Henderson to the en banc court of common pleas. She quoted from Henderson the two passages. I don't take them to be arguing against that. I take their argument to be, and this is the one I'm trying to get you to respond to, he pinned his credibility determination on an erroneous factual assertion. He said she never disclaimed having a racial motivation. In fact, she did disclaim it. She disclaimed it twice. Here's where it is in the record. What's your response to that? My response is that Judge Padova laid out in the opinion, I think, the factors that he considered in determining that the prosecution relied on Henderson. Do you agree with your opponent that he was wrong when he said she never disclaimed a racial motivation? Yes, to a degree. And let me explain. I don't mean to parse words here, but it is correct that there are two instances in the record in which she makes general denials as to discrimination. It seems to me in reading the record, in reading both the record and Judge Padova's assessment of Ms. Rubino's reliance on Henderson, that when he talks about why her reliance on Henderson entitles us to make an inference, entitles him to make an inference of discriminatory practice, that that finding of reliance on Henderson is not dependent upon every single one of those individual things being true. It doesn't fall if you take any one particular one out of that. And on top of that, when you take a look at the general denials that Ms. Rubino made, if you take a look at what Judge Padova did in his discussion in the Henderson section, in the Henderson section he's talking about does the Commonwealth, does Ms. Rubino make a defense of its stripes? And I read making that defense of the stripes as did they make a defense as would be understood under Batson. She made a defense as would be understood under Henderson. Well, how else would she have made that defense since Batson didn't exist and Henderson did? Your opponents, I think, quite rightly say it's pretty tough to fault somebody for citing controlling case law. Correct. But there's a difference between citing controlling case law and what Ms. Rubino did in this case. Isn't that true only if you accept Judge Padova's assertion that when she cited Henderson, she never said, well, look, I didn't discriminate. But even if I had, I'd be entitled to under Henderson. I mean his assertion seems to be she never said that. In fact, she did say that. Isn't that problematic for you? Their argument is more credible if you read the record in isolation. But Batson requires that the record be read in the entirety. And what's clear is what Judge Padova was doing was reviewing everything in its entirety. Now, let's take a look at specifically what Henderson said because there's relevance not just statements on Henderson but the statistics and the individual practices. And the three of them put together create an overwhelming inference that she was relying on Henderson. Remember, Henderson says that it's permissible to strike individual jurors on the basis of race. Henderson also has a systematic discrimination component where it says that it's permissible but only if you accept at least one black juror. And what you see in what Ms. Rubino did, and this is the statistical side of it, Ms. Rubino accepts 22 of 24 white jurors. She strikes 12 of 14 black jurors and the only Latino juror who survives the challenge for cause. What you end up with is 15 jurors who ultimately get impaneled. One white juror gets excluded because of medical reasons. And Donald Hardcastle gets tried before a jury that is 12 white jurors, two white alternates, and one black juror. She has impaneled the one black juror that in her argument with Judge Stout at the en banc, she makes clear she believes that one black juror is all you need to avoid systematic discrimination. But how can you make that argument, though, and you're using statistics to do that when she impaneled two black jurors? She chose two black jurors. You want to overlook the fact in your argument that actually there were two. No, Your Honor. From the purpose – I mean, it's true she accepted two. It's true she accepted two. Okay. Isn't that a little different argument than saying she only accepted one? I didn't say she only accepted one. Her belief was that you don't have systematic discrimination so long as at least one juror is impaneled. So she knew she had to have – her belief was she had to have at least one black juror on the panel, and that's what she got. So once she got there, she believed she had satisfied what she needed. It seems to me to be a lot of inferences on top of inferences to get to that conclusion. She never said that. Well, those are inferences that Judge Cordova is entitled to make. But the mere fact – I think the question that both Judge Bjorda and I have on Henderson is that the existence of Henderson as the law at the time this jury was selected doesn't prove that she intentionally struck black jurors. And that is what you have to prove under Step 3 of Patson. And I question, particularly with the two places in the record where Judge Cordova ignored the prosecutor's statement that she didn't intentionally discriminate, whether or not it's proper for the district court to have relied on this Henderson-type argument in coming to this conclusion. I think that obviously if this court believes that he was viewing – that he overlooked that as opposed to viewed it as she did not defend herself in a manner that you would under Batson, because she did not articulate what her strikes – what the reasons for her strikes were. She disclaimed any possibility of being able to articulate what her strikes were. Then with respect to that limited portion of Judge Cordova's fact findings, you would give less weight to his determination that she relied on Henderson. But that's not the only reason that he says that she relied on Henderson. That's part of why she relied on Henderson. I mean, there's also his statement – What else did he say? Well, he points to the multiple places where she aggressively argues that it is permissible to strike jurors on the basis of race, both in the written brief that's filed and in the oral argument. And he points to the portion in the oral argument where she not only says, put more reductively, it is permissible to strike jurors on the basis of race, creed, national origin, or so forth. But that's still – I think the problem with the review of this, as I read it, is it's almost – the district court is almost saying that since Henderson was the law when this jury was picked, she must have intended to discriminate. I don't read it that way, Your Honor. And the reason I don't read it that way is because Judge Cordova could have said that if that's what he meant, and he didn't say that. And it's clear – Judge Cordova relied on a variety of factors in combination. How much did he rely, if you can tell us, on the fact that she was tracking race while the strikes were happening? Was that part of the Henderson analysis? Part of the analysis is that she was conscious of race. Is there something wrong with that in this case particularly where you have a black defendant, black victims? I'm sorry? Where you had a case – in this case, you have a black defendant and you have black victims. Is there something wrong with having race consciousness and keeping track of race? Well, when you say wrong, I have some – Per Batson. Per Batson. Race consciousness permits inferences. And the fact that she was conscious of race and kept track of that through her notes permits an inference. I think it's interesting the manner in which she took the notes. And I know that Mr. Dulcinius and I disagree fairly strongly on this, but I think it's instructive the manner in which she – Putting down the two and the three and not the one. Putting down the two and the three and not the one when she was talking about the veneer as a whole. And then treating it differently when it came to jurors who were impaneled and jurors who were struck. When it came to jurors who were impaneled, the only juror that has a race code next to it is the black juror who was impaneled. When it came to jurors who were struck, the only juror who was struck who has a race code next to it is the white juror. So that permits an additional inference. You know, I mean, if Mr. Rubino were to take the position that, well, you know, there were a lot more white jurors, so I just kept track of the minorities, it would be one thing. But to categorize it and keep track differently in the different categories, that, I think, is evidence from which the court was entitled to draw an inference of race consciousness and an inference of potentially discriminatory intent. And especially, you know, that particular form of note-taking connects well with Henderson and the understanding that in order to avoid a potential constitutional violation, you have to have at least one minority member on the panel. And so she jots that down, and that's the code that's there. You know, it's not racial identification across the board. We've specifically identified this individual. And that's a fact-finding for Judge Padova to determine. And Judge Padova determines that that weighed in favor of discriminatory intent. Are there any other examples you can point us to of credibility-type finding or findings of fact that would take us beyond what Judge Fischer has noted here is a lot of people in a room 25 years later trying to figure out what handwritten notes mean? Sure. I think there are a whole range of credibility determinations. I mean, obviously, one of the first ones is the question of Henderson. Right. We know that. But interestingly, though, one of the things that permits the judge to make an inference on Henderson, it goes beyond anything that happened in the record. It goes on what happened directly in front of him. When I asked Ms. Rubino about it, she specifically disclaimed relying on Henderson. And when I read her the quote that she argued, she disclaimed having relied on Henderson. So Judge Padova saw that and saw that that was just simply not credible. And he's allowed to, from that, draw other inferences about her credibility in other matters. But when we talk about individual jurors, for example, and I don't want to go through all of them, but with Lisa Stewart, for example, Lisa Stewart, the first juror that she exercised the peremptory challenge against, she doesn't even ask a single question of Ms. Stewart. And then in her testimony in the district court, when she is trying to say what the reasons were that she struck Ms. Stewart, she talked about her age. She never asked about her age, but she talked about her age. She talked about her instability, that she was raising a child alone. She never asked whether she lived alone. It was a pure assumption that she made that Ms. Stewart lived alone. And she drew a whole bunch of assumptions. She made a whole bunch of assumptions, and the assumptions varied depending upon the race of the juror. So, for example, later on in the question of, I believe it was Gladys Workman. Gladys Workman, during her war year, Gladys Workman appeared nervous. According to Ms. Rubino, she, quote, appeared very nervous. There is nothing in the record that suggests any degree of nervousness. Now, Ms. Rubino did say during the war year, and it appears on the record, try to relax. You look nervous, try to relax. And so that gives some credibility to her assertion that Adrienne Marsh was nervous. But when Claire Hoven volunteered during war year, that she was nervous, and Judith Rubino says in response, try to relax. The exact same words. She doesn't even mention nervousness at all in her testimony when it comes to Claire Hoven. So she draws different inferences. It comes to the point that Mr. Dilgenes is pressing a pause, which is when you're dealing with a group, a relatively small group, and individuals are going to be diverse within that group on a whole range of things, that if you want to go about it, you can find points of similarity and you can find points of distinction, but the prosecutors don't exercise strikes like that. They don't say, it's all going to be all the singles or it's going to be all the marrieds. They take each person as a package and say, I can live with this one. Or I'm not wasting a strike on this one because I know the defense can't live with this one. And that's how people in the real world, picking a jury in a criminal case, operate. Doesn't what you're saying right here kind of lend support to his assertion that Judge Padova was engaged in an analytical, sort of vegematic exercise that doesn't reflect the way slicing and dicing really happens because people don't slice and dice that way when they're picking juries. Judge Padova was faced with the following predicament. You have a prosecutor who does not remember. So she cannot say what her actual reasons are with respect to anybody. So this is not a case where he's got to choose, where Judge Padova has to decide, well, she said she relied on X, Y, and Zs and relied on it in particular measures. No, she never is able to say how she whacked all these things up. And, in fact, Mr. Dolgen, during the argument, talked about what we really seem to have here is a jumble of factors for each person, and there's a rule of one for each person. But Judy Rubino was never able to say how she decided on any particular juror. So if you've got these jumbles of characteristics on both sides, and Judge Padova is forced to decide whether. . . So what you're saying is he did what he had to do here because of the character and posture of the case. That's correct. All right. That's correct. Which gets us back to my original question about how we review this. Under clear error. And what the judge is faced with a fact-finding conundrum, and there are two types of comparative analyses that he can do. And one of them, obviously, is the cookie-cutter approach, which Miller-Ellis says you don't have to do, but you look for relatively similarly situated jurors. And the Commonwealth made arguments that some jurors were not sufficiently similar, and Judge Padova made factual determinations as to whether they were sufficiently similar. Let's suppose we concluded that from the record that the jurors were really struck because, and I'll just take Lisa Stewart for example, that she was struck because she was an unemployed mother and that she was African-American. And those were the two reasons. Does that meet the Batson test? That is a violation of Batson, yes. Even though it's not solely? If we look at the record and say, you know, we think that Judge Padova couldn't conclude that she wasn't struck because she was an unemployed mother, but we can conclude that maybe he determined on other factors that part of the reason was that she was black. Does that meet Batson? Yes, because she is significantly, the choice to strike was significantly because of her race. But doesn't Batson use the word solely? Doesn't Batson say the equal protection violation occurs when the strike is solely motivated by race? Batson, if you take a look at Miller L. and you take a look at Snyder, I think it's pretty clear that if the reason for the strike is that you are single and you're black, I think that's analogous to saying that if you're single and you're white and you're going to be accepted, that reduces to you were struck because you were black. And take a look. I used the example different. You were struck because the prosecutor legitimately didn't want to have someone who was an unemployed mother. And the record was sufficient to show that maybe she didn't want to have more than two blacks on the jury. But I guess I'm getting back to, you know, is there, there's. This goes, Your Honor, very much to exactly what Judge Padova did. Because when we're talking about the comparative analysis, Judge Padova at step two, he has to decide whether there is a facially neutral reason. At step three, he's got to decide whether there's an actual reason and whether the actual reason is race neutral. And so when he goes characteristic by characteristic, he's assessing not just whether it's pretextual, but whether it's the actual reason. And since she can't give global reasons why she accepted or struck anybody, he's got to go at them one at a time to take a look at what the actual reasons are. So when you have the juror who one of the proposed actual reasons is that she's single, and you see that seven of eight single white jurors are accepted and all six white, all six black jurors are struck, then that goes not just to pretext, but whether it's an actual reason. And so when Judge Padova finds for each of these factors, and he does it, he goes through all the jurors on this, and he finds that there is a difference in the way white jurors and black jurors are treated with respect to each of these reasons, and therefore he finds it implausible that those were her actual reasons. That is an absolutely permissible and appropriate way of going about it. In fact, it's exactly what this court did in Holloway. In Holloway, the question, the issue was, was the juror the same age as the defendant? And what did this court do? It looked at that characteristic. It didn't go beyond the characteristic of age and see what other favorable factors were in the background of the white jurors who were accepted. It looked to see if that was the actual reason, and it wasn't. Here, Judge Padova did a characteristic after characteristic, age. If you're younger, about the same age, in the 20s, every white juror in the 20s was accepted. Every black juror in the 20s was struck. A question of employment. What about in the 20s and unemployed and single? Do we have, Mr. Georgianis was talking about you need a consideration of combination of factors. But Ms. Rubino was never able to offer as her actual reason that she said that these were factors that she considered. She was never able to give any kind of weighing to it, so you could never say how much weight she would give to other things. And during the cross-examination, when I pointed out inconsistencies in the way she treated jurors, she always fell back on, well, I can't tell you how much I weighed this or that. So in that circumstance, Judge Padova is absolutely entitled to say, well, the only thing here that's in front of me that isn't completely a jellyfish, the only thing that I can nail to this wall are the underlying reasons, and let's assess them. And when we look at them, we take the reasons as applied with respect to black jurors, the reasons as applied with respect to white jurors. And remember, Judge Padova, to find discrimination in this case, only needs to find it once. What's the strongest one you've got? Well, who's the – you've got six ones, the jurors that he says there's a finding asked to. Which one would you folks point to and say, this is a locked cinch? I think it's hard to say which one because I think – Humor me. Well, let's take Adrienne Marsh. She's the one that the Commonwealth said was the best case during the oral argument in the district court. And let me step back one step and come forward from there. In the district court argument, Mr. Doldress divided the jurors into three categories, those to which he thought there were obvious reasons to strike, and in fact they persuaded Judge Padova to change his mind with respect to Mr. Richardson. Those in which there were people who were – I'm sorry, Kim Richards. Those in which there were certain professions, like social work or DPW, and they were able to persuade Judge Padova to change his mind with respect to James Richardson. The third category was the category that based on the record, as he argues it on I think it's pages 58 and 59 and 57 and 58 of the oral argument in district court, are the cases in which he believes it is arguable. And, of course, it is arguable from the perspective of clear error. It can only be arguable if there is credible evidentiary support for it or a rational relationship to the record. And, of course, if you have either of those, we win under clear error. Mr. Dunn, you have an additional five minutes. Thank you. Now, when it comes to Adrienne Marsh, Adrienne Marsh is – Judith Urbino has said being a teacher is a good thing, being involved in education is a good thing. Adrienne Marsh is from Mount Airy. She's a school aide. She's been exposed to a little bit of pretrial publicity and has children who could arguably be considered close in age to Hart Castle. Well, she's from Mount Airy, but there are two black jurors from Mount Airy. Both are struck. There are two white jurors from Mount Airy. Both are accepted. She's a school aide, and there is a teacher who – and I believe it's Dorothy Roshan. There is a teacher who is white who is accepted. Judge Padova finds them somewhat comparable but accepts that since Ms. Urbino is interested in having an intelligent jury, and that's part of the reason why she said she wanted teachers, that he should look beyond just the label school aide and teacher, and so let's take a look at educational levels. And so he takes a look at the educational levels, and what does he discover? If you are white and you went to college, you get accepted. Also, if you're white and you didn't go to college, you get accepted. If you are black and you didn't go to college, you're struck. If you're black and you went to college, you still, most of the time, got struck. Now, obviously, intelligence is not something that screams off the page of the transcript. You can't tell by looking at the questions what the level of intellect was. So Judge Padova had to make some kind of fact-finding, and he, looking at the record, found that that was not the reason. Now, the Commonwealth would argue, though, that he would look at those facts, but not that he didn't consider supplemental facts. For instance, James Dougherty was James Dougherty's age when he didn't go to college, but he knew one of the police officers. But Dorothy – Well, but he more than knew the police officers, though.  Okay. But he went to parochial school. There were a lot of other facts there. So when you isolate into the one fact that Judge Padova used to disqualify the Commonwealth's argument, it ignored the other – I call them supplementary. But it eliminates the other comparisons that the Commonwealth used to overcome the one comparison, which there were equals who were selected. Isn't that – is that perhaps not a sound basis to say that his findings were erroneous, at least as to that fact on that juror? No, Your Honor, because under clearly erroneous, it's not whether in assessing the combination of factual patterns that this court could assess individually, you might have come to a different conclusion. It is whether, based upon the record, there is some credible evidence to support what he decided. And there is. There's a lot of credible evidence that supports it. And, in fact, Your Honor, he is entitled – each time the Commonwealth offers an explanation that's implausible, he's entitled to draw an inference of discrimination. And that one inference of discrimination is entitled to spill over to the other explanations. So when you have not one, not two, but a whole host of explanations where there is clear race difference in the manner in which the Commonwealth treated the stripes, then you have not just an additive, not just a series of individual findings of implausibility, but you have this global environment in which everything that's being offered for six jurors seems implausible. And then on top of that, you add the statistical pattern. The fact that the odds that a white juror would be struck if they were black are 66 times greater than if you're a white juror. And you add into that the historical background. Henderson, the fact that a prosecutor who believed she was following the law would still be striking jurors or might still be striking jurors on the basis of race because she thought that was permissible. The judge is entitled to consider all of those. And Judge Padova considered all of those. And he added them all up. And, you know, we don't have to prove that Judy Rubino discriminated against six jurors. We don't even have to prove that Judge Padova was correct with respect to all six jurors. All we have to show is that there is credible evidence in the record for one finding of discrimination against one juror. And even in Williams, Chief Judge Becker, when he wrote the opinion, I'm sorry, Wilson noted that the record supported discrimination for eight jurors, but the judge didn't even have to identify which one it was. Well, here Judge Padova has identified six. And there is record support for six. And I don't know what more a district court could do. This is some of the most meticulous fact-finding that I have ever seen. Maybe he made a mistake here and maybe he made a mistake there. But the question is not whether we can fix this. The question is whether his fact-finding has some credible evidentiary basis. And, Your Honors, it does. Do you have anything else, too, you want to wind up with, Mr. Dunn? Your Honor, I think that very simply what this comes down to is this case has been around a long time. Every court that heard Judith Rubino provide her explanations found discrimination. The Court of Common Pleas in Philadelphia in 1983, the en banc court, after she made her Henderson argument, found discrimination. They said that they believed that her strikes had no basis except for race. Judge Padova, years later, found discrimination. Every time people look at what happened, it screams out discrimination. And I think that Judge Padova did a very, very thorough and painstaking job. I can't see how it's remotely possible under a clear air standard that his findings don't hold up. Thank you, Your Honor. Thank you, Mr. Dunn. Thank you, Bill Dennis. Thank you, Your Honor. I'll try not to get worked up this time. Just a few very brief points. First of all, let me address the standard of review because this is an important issue, obviously, in this case. I have Riley in front of me, and Riley says that there are two reasons why clearly erroneous is not exactly the standard to be applied in a situation like this. Number one, the court says, we decline to give these findings deference because such deference is ordinarily based, at least in part, on the original trial court's ability to make contemporaneous assessments. On the very next page, the court says here, and again, explaining why the clearly erroneous standard doesn't quite apply. Wait, wait. Let me stop you.